[Civ. No. 985.   Second Appellate District.—June 13, 1911.]

FRANK N. THOMAS, Respondent, v. WENTWORTH HOTEL COMPANY, a Corporation, et al., Defendants; MORTIMER FLEISHHACKER, DAVID NEUSTADTER, JACOB H. NEUSTADTER, and S. BACHMAN, Appellants.

CORPORATIONS—SUBSCRIPTIONS FOR STOCK—INABILITY TO PAY—COMPROMISE BY DIRECTORS—RELEASE OF HALF SUBSCRIPTIONS—PAYMENT FOR RESIDUE.—Where subscribers to the capital stock of a corporation, owing to great financial loss as the result of the San Francisco fire, were unable to pay for all the shares subscribed, the board of directors of the corporation had power to compromise such subscriptions by releasing one-half thereof, and taking and selling

the same as treasury stock, in consideration of their accepting and paying for one-half of the stock subscribed by each of them.

ID.—STOCKHOLDERS BOUND BY ACQUIESCENCE—ESTOPPEL.—The stockholders of the corporation are estopped from objecting to the power of the board of directors to make such compromise, where, at a subsequent meeting of the stockholders, such subscribers were recognized as holding only one-half of their original subscriptions, and with their acquiescence, the corporation dealt with and resold the surrendered stock as its own. (Beatty, C. J., Dissenting.)

ID.—LIABILITY TO CREDITORS.—Though such compromise cannot affect the liability of the stockholders upon their original subscriptions as to creditors whose claims were then existing, yet such compromise will be valid as to all future creditors who have no contractual liability to prevent the same, and who cannot complain thereof.

ID.—TERMS OF COMPROMISE—PART PAYMENT—FUTURE PAYMENT AFTER NOTE DUE—EFFECT NOT POSTPONED.—The fact that by the terms of the compromise effected a specified amount of cash was to be paid on one-half of the stock, and a specified credit was given for the residue, which was not paid until after one of the notes sued upon fell due, did not postpone the effect of the compromise, which was valid and effective when agreed to, and it was not subject to such note. (Beatty, C. J., Dissenting.)

ID.—GENERAL RULE AS TO RELEASE OF SUBSCRIBER TO STOCK.—It is the general rule that a subscriber to the stock of a corporation cannot be released from the obligations of his contract of subscription without the consent of his fellow-stockholders and of the subsisting creditors of the corporation.

ID.—REASON OF RULE—TRUST FUND FOR CREDITORS.—The reason of the rule is that the subscribed stock is a trust fund for the subsisting creditors of the corporation, whose rights cannot be reduced, diminished or impaired except with their consent.

ID.—EFFECT OF RELEASE OF SOLVENT STOCKHOLDER—EXPRESS AUTHORITY REQUIRED.—An express authority must be given by the by-laws to authorize the release of a solvent stockholder as to future creditors; but he cannot be released as to existing creditors, who may proceed against the retiring stockholder upon his statutory liability, notwithstanding such release.

ID.—EXCEPTION TO RULE—COMPROMISES WITH INSOLVENT SUBSCRIBERS. It is an exception to the rule that express authority in the by-laws is required, where compromises are effected by the board of directors with insolvent or irresponsible subscribers to the capital stock of the corporation, so as to release them both as to the corporation and as to future creditors, as to fifty per cent of the obligation of each.

ID.—RESOLUTION EMPOWERING MANAGERS TO BORROW MONEY AND EXECUTE NOTES—WANT OF AUTHORITY TO PAY ATTORNEY'S FEES.—A

resolution of the board of directors of the corporation empowering
the managers of the corporation to borrow money and execute notes
therefor, did not authorize them to bind the corporation by a con-
tract to pay attorneys' fees in the event suit was brought on the
notes so executed, and attorneys' fees were improperly allowed in an
action upon the notes against the corporation and its stockholders.

ID.—PERSONAL LIABILITY OF STOCKHOLDERS OF FOREIGN CORPORATION
DOING BUSINESS IN THIS STATE.—The stockholders of a corporation
organized under the laws of Arizona for the purpose of doing busi-
ness in this state are subject to personal liability to the extent
that the number of shares owned by each shareholder bears to the
whole number of its subscribed capital stock, as prescribed in sec-
tion 322 of the Civil Code.

APPEAL from a judgment of the Superior Court of Los
Angeles County, and from an order denying a new trial.
Curtis D. Wilbur, Judge.

The facts are stated in the opinion of the court.

I. M. Golden, Rothchild, Golden & Rothchild, and J. M.
& H. L. Rothchild, for Appellants.

Porter & Sutton, for Respondent.

JAMES, J.—Action brought to enforce payment of two
promissory notes executed by the Wentworth Hotel Company,
a corporation, one being for the sum of $22,500, made in
favor of the First National Bank of Pasadena, and the second
for the sum of $25,000, made in favor of the Union Savings
Bank of the same city. Appellants were joined as parties
defendant because of the fact that they were owners of stock
in the hotel company at the time the indebtedness sued on
was incurred, and recovery was sought against them on their
shareholders' liability arising under the provisions of section
322 of the Civil Code. Judgment went against appellants
for the amount prayed for, except that a deduction of 150
shares of stock was apportioned as a credit among appellants
Fleishhacker and Bachman, reducing the number of shares
found by the court to be held by them at the time the indebt-
edness was incurred to the following totals, respectively:
Mortimer and Herbert Fleishhacker, 137½ shares each; S.
Bachman, 275 shares. The occasion for the making of this
reduction is hereinafter referred to in connection with the

mention of stock issued to Lewis C. Warner and C. Dana Warner. The appeal is from the judgment and from an order denying a motion for a new trial.

The Wentworth Hotel Company was organized under the laws of the territory of Arizona for the purpose, in part, of transacting business in the state of California. The par value of the stock was the sum of $100. At the time of the organization of the company the appellants were subscribers for shares of stock in the following amounts, to wit: Mortimer Fleishhacker and Herbert Fleishhacker, 175 shares each; David Neustadter and Jacob H. Neustadter, 150 shares each; S. Bachman, 350 shares. No certificates representing the stock were issued to any of the subscribers until November 8, 1906. The subscription contract was signed by appellants prior to the date upon which the indebtedness represented by the two promissory notes was incurred, and provided that payment for the stock subscribed for should be made in four equal installments not less than sixty days apart, upon fifteen days' notice from the treasurer of the company. The promissory notes represented money borrowed from the respective banks for uses of the corporation. The date of the note to the First National Bank was October 5, 1906; that to the Union Savings Bank was November 16, 1906. On August 23, 1906, and before any payment had been made by appellants on account of their subscription agreements, the board of directors of the hotel company adopted a resolution whereby they proposed to release appellants Mortimer and Herbert Fleishhacker and S. Bachman from their obligation as to one-half of the number of shares subscribed for by each. This resolution recited in substance that, as the said appellants had suffered great loss and damage by the earthquake and fire in San Francisco, to such an extent that they were unable to take all of the stock subscribed for and pay for the same, but as they were willing to take one-half of the number of shares so subscribed for and to make certain cash payments, and that it appeared to be for the best interests of the company to enter into such agreement, that the said appellants were, therefore, released from their subscriptions to the extent stated. Under the terms of this resolution, $5,000 in cash was to be paid by each of the Fleishhackers and $3,750 was to be paid by each on November 1, 1906. Bachman was

to pay the sum of $10,000 in cash and $7,500 on November 1, 1906. On October 10, 1906, by a resolution similar in terms, the two Neustadters were to be released from liability as to one-half of the amount subscribed by them upon the payment in cash of the sum of $7,500 each, these amounts being in full payment for one-half of the stock mentioned in the agreement of subscription executed by these two appellants. The amounts of money mentioned in these resolutions were paid by appellants in accordance with the terms thereof. If the adoption of these resolutions operated to release appellants at the time the action referred to was taken by the board of directors of the hotel company, then at the time the notes were executed the two Fleishhackers and S. Bachman were the owners of only one-half of the number of shares of stock originally subscribed for by them, and the Neustadters had been released from liability as to a like proportion of their subscription for stock after the first note was executed, but before the note for the sum of $25,000 was made in favor of the Union Savings Bank on November 16, 1906. The trial court determined that the releases attempted to be made were all invalid, and that all of the appellants were liable for their proportion of the indebtedness represented by the two promissory notes up to the full number of shares of the stock contracted to be taken by them under their subscription contracts. The question as to the validity of these releases is the principal one argued. The position taken by respondent is that a subscriber to stock of a corporation cannot be released from the obligation of his contract, except by payment according to its terms, or with the consent of all the remaining stockholders and the creditors of the corporation. With this contention the trial court agreed; hence, its judgment.

Stating the rule in its general sense, it is correct to say that a stockholder may not be released from liability on his contract of subscription without the consent of his fellow-stockholders, as well as that of the creditors of the corporation. The reason for the rule is found in the doctrine, now thoroughly established by the decisions of the American courts at least, which views the subscribed capital stock of a corporation, both paid and unpaid, as a trust fund which the stockholders and creditors have the right to insist shall not be reduced, diminished or impaired except with their consent. (1 Thompson

on Corporations, par. 765; *Morgan* v. *Struthers,* 131 U. S. 246, [9 Sup. Ct. Rep. 726, 33 L. Ed. 132].) In considering the application of the rule just stated, however, it must be kept in mind that the creditor of a corporation is not a direct party to the contractual relation entered into between the corporation and a subscriber to its capital stock. Under the trust fund theory the creditor is presumed to have given credit upon the faith that the working capital of the corporation, whether actually paid in or promised to be paid, will be kept available to satisfy his debt. The corporation, then, cannot, without committing a fraud against such creditor, wipe out the fund either by returning the money paid by subscribers or releasing the obligors on their unpaid subscription contracts. The rights of the creditor, nevertheless, do not extend so far as to permit him to interfere and prevent a stockholder from altering his relation toward the corporation with respect to his membership therein as a holder of its shares. It must be admitted that a solvent stockholder may make a valid agreement with the corporation, securing first the consent of all the other stockholders thereto, by which he may surrender his stock and be released on his subscription contract; such an agreement will be valid and binding upon the corporation, although it may not prevent existing creditors from having recourse against the retiring stockholder to compel contribution from him in satisfaction of their claims in an amount proportionate to the unpaid balance of his subscription. In what has just been said we have referred to releases made by consent, and where no consideration of doubtful claims or compromises with insolvent or irresponsible subscribers enters into the transaction. This for the purpose of pointing out that a creditor may not complain of the act of a corporation in waiving its right to enforce payment from a subscriber and accepting the relinquishment of his shares of stock. As the creditor may only be damaged by a cancellation of the subscription liability, and if this liability remains with the subscriber after his withdrawal from the corporation, for the benefit of the complaining and nonconsenting creditors, that is all that such creditors have any right to demand or insist upon. It may also be said that the rule of the decisions is that this power in the stockholders to accept a surrender of the shares of a subscriber may not be exercised by a board of

directors in the absence of express authority given them by the charter or by-laws of the corporation. (3 Clark & Marshall on Private Corporations, sec. 692, subd. 1; 1 Thompson on Corporations, par. 763; 1 Morawetz on Private Corporations, sec. 112.) Yet, while general authority is not reposed in a board of directors to accept a retransfer of stock from a subscriber and so terminate the relation of the latter as a shareholder, an exception is recognized by the authorities and text-writers to the extent of admitting that the directors may make compromises with the subscribers whose liability is questioned, who are insolvent, or who are of doubtful financial responsibility. Such compromises usually take the form of that which was entered into between the defendants here and the Wentworth Hotel Company by its board of directors; that is, in consideration of the subscriber paying for a portion of the shares agreed to be taken, he is released, so far as the corporation is concerned, as to liability for the remainder. We quote: "The directors of a corporation ordinarily have no authority to release stockholders from liability on their subscriptions otherwise than in pursuance of a *bona fide* compromise, or for a sufficient consideration. But they may compromise with subscribers, as with other debtors, and may release a subscriber where there is a sufficient consideration, so that there is no fraud or wrong as against creditors or other stockholders." (3 Clark & Marshall on Private Corporations, sec. 692, subd. 1.) Again: "The corporation, in case of a subscriber's inability to pay for his shares, or in case of *bona fide* disputes as to his liability, may *bona fide* compromise the dispute upon surrender of his shares, and release him from liability thereon. While the directors may compromise doubtful claims, they have no authority to release stockholders from liability upon their binding and undisputed contracts of subscriptions. . . . (Sec. 242.) The directors or corporate officers may compromise doubtful claims against subscribers to capital stock." (1 Purdy's Beach on Private Corporations; see, also, 2 Morawetz on Private Corporations, sec. 841.) In Cook on Stock and Stockholders, at section 171, the author says: "A compromise differs from a cancellation, in that the subscriber pays to the corporation a part of the subscription price in order to be released from the balance. The stock is delivered back to the corporation. The corporate authori-

ties—generally the directors—have power to compromise any corporate debt; and if in the collection of subscriptions, there is reasonable doubt as to the liability of the subscriber, or if the subscriber is insolvent, the corporation may compromise the liability and release a part for the purpose of securing the residue. All that is required is good faith." We cite also: *Republic Life Ins. Co.* v. *Swigert,* 135 Ill. 150, [25 N. E. 684, 12 L. R. A. 328]; *Morgan* v. *Lewis,* 46 Ohio St. 1, [17 N. E. 558]; *Whitaker* v. *Grummond,* 68 Mich. 249, [36 N. W. 62]; *Erskine,* v. *Peck,* 13 Mo. App. 280. We think the action taken by the board of directors of the Wentworth Hotel Company in making the releases in favor of the appellants, under the statements of the text-writers quoted from and decisions just cited, was within the authority of such board as the managing agents of the corporation. But let us assume that the action was not within the power conferred upon the directors: It would have undoubtedly been valid if accompanied by the unanimous consent of the remaining stockholders. No stockholder, so far as the record in the case shows, has ever repudiated the action of the directors, and no creditor whose debt existed at the time the resolutions were adopted can be affected by the action taken. Furthermore, the stock upon which the defendants secured the releases was treated ever afterward as the stock of the company and a large number of shares thereof were resold to new subscribers. This action was brought more than six months after the compromise agreement was entered into. At a meeting of the stockholders held in December, 1906, the records of the corporation show that appellants were recognized by the corporation as holding only one-half of the number of shares of stock originally subscribed for by them. The compromise agreement between the corporation and defendants was fully executed. The corporation dealt with the surrendered stock as its own and resold, on November 8, 1908, 50 shares thereof to Lewis C. Warner and 100 shares thereof to C. Dana Warner, these shares so sold being the number which the trial court apportioned to the holdings of the two Fleishhackers and Bachman as a credit. All of these facts would seem to make the case a proper one for the application of the rule of estoppel, which would prevent any stockholder from now objecting to the authority of the directors to make the re-

leases complained of, and to warrant the conclusion that all stockholders acquiesced therein. It is not claimed that the directors acted in bad faith nor that the action taken was not, as the resolution recited, for the best interests of the company and because of the fact that appellants were unable to take and pay for more than one-half of the stock agreed to be taken under the terms of their subscription contract. Our supreme court has said in the case of *Tulare Savings Bank* v. *Talbot*, 131 Cal. 45, [63 Pac. 172] : "While it is true that a contract of subscription may be modified or annulled only by the unanimous consent of the stockholders or by the board of directors duly authorized thereto (*Pacific Fruit Co.* v. *Coon*, 107 Cal. 452, [40 Pac. 542]), such release may be proved not only by the records but as well by the acquiescence of the stockholders of the corporation." The act of the directors was not *ultra vires* because the result effected might at first consideration appear to be, that some of the capital stock had thereby been withdrawn. Treating of a similar situation, the supreme court of Ohio, in the case of *Morgan* v. *Lewis*, 46 Ohio St. 1, [17 N. E. 558], used this language : "The finding of the referee that this transaction worked a reduction of the capital stock of the company is not tenable. There was nothing in the way of the company reissuing this stock or its equivalent to others who may have desired it. There was nothing in the fact that these certificates were marked 'canceled' on the face by the secretary of the company, and by him treated as surrendered stock, to authorize the finding that the capital stock was reduced. This was no part of the transaction with Morgan, and there was nothing in the fact of the re-exchange of the stock for the furnace which called upon the officers of the company to treat the stock as canceled, or the capital *pro tanto* reduced. (Green's Brice's Ultra Vires, 2d ed., 191, 192.) This conclusion is not qualified by the fact that the stock was not thereafter represented." (See, also, 1 Cook on Stock and Stockholders, sec. 282.)

We conclude, therefore, first, The board of directors had authority to enter into the compromise agreement releasing defendants from a portion of their subscription liability and accepting the surrender of a part of the shares of stock agreed to be taken, and that defendants ceased to be stockholders from the time of the making of that agreement; second, as-

suming that no authority existed authorizing the directors to so act, that the corporation and stockholders thereof have become bound by acquiescence from raising any question as to the validity of the releases.

The record shows that the deferred payment on account of the purchase price of one-half of the stock was made by the Neustadters on October 8, 1906. The fact that a portion of the money required to be paid by the defendants Fleishhackers and Bachman under the terms of the resolutions of release were provided to be paid on a day subsequent to the date of the making of the cash payment, did not postpone the effect of the compromise agreement until all of the money had been paid. A new contract was entered into at the time of the adoption of the resolutions between the corporation and appellants, which was, in effect, a novation. A novation is made: "1. By the substitution of a new obligation between the same parties, with intent to extinguish the old obligation." (Civ. Code, sec. 1531.) The obligation of all of the parties to the subscription contract was changed. On the part of the corporation certificates for one-half of the number of shares of stock subscribed for were not to be issued, but the stock was to be held by it, and a large amount of money was paid as a further immediate consideration moving to the corporation. The time for payment of the balance of the purchase price being deferred did not have the effect of continuing Mortimer and Herbert Fleishhacker and S. Bachman in their relation as stockholders for the full amount of their subscription until the final payment had been made. In the case of *Griswold* v. *Pieratt,* 110 Cal. 263, [42 Pac. 820], a change was worked in the agreement of the parties to the contract there considered, by the introduction of new and different terms. In discussing the question as to the effect upon the original obligation in that case, the supreme court said: "The original contract was suspended, if not extinguished (Civ. Code, secs. 1531, 1682) ; the plaintiff, while the new compact between himself and defendant remained in force, could maintain no action for any breach of duty by defendant under the former. His only proper course, if such breach had occurred, was to impeach the settlement by appropriate pleading for fraud, accident, or mistake. . . . Since defendant pleaded facts showing that the original contract was superseded by a new

obligation, he showed that neither party has any rights based upon it.'' The resolution of the board of directors of the hotel company expressly recited that the obligors on the original subscription contract were then released, and the effect of the transaction, which was fully carried out, as we have before mentioned, was to put an end both to the right of appellants to demand more than one-half of the stock subscribed for by them, and also to the right of the corporation to enforce payment for more than a like proportion of the subscription indebtedness.

The release of defendants Neustadter was shown by the resolution of the directors to have been made on October 10, 1906, and it was in consideration of the payment of $7,500 in cash by each of these two men. The fact that the payment of these amounts of money was shown to have been made two days before the resolution of release was adopted and recorded is, we think, immaterial. It is sufficiently clear that the payments were made pursuant to the compromise agreement entered into by the officers of the corporation, which by the action of the board of directors was made binding. It follows, then, that on November 5, 1906, at the time the indebtedness of $22,500 to the First National Bank of Pasadena was incurred by the Hotel Company, the two Fleishhackers were the owners of 87½ shares each, instead of 175 shares originally subscribed for by each, and that S. Bachman was the owner of 175 shares, instead of 350 originally subscribed for. The release of the Neustadters not being made until October 10, 1906, these latter appellants were liable for the indebtedness of $22,500 on the full number of shares represented by their subscription agreement. The indebtedness on the note dated on November 16, 1906, executed to the Union Savings Bank of Pasadena for the sum of $25,000, was incurred after the several appellants had been released from their obligation to accept more than one-half of the number of shares of stock subscribed for.

The resolution of the board of directors, whereby authority was given to the managing officers of the corporation to borrow money and execute notes therefor, did not give express authority to such officers to bind the corporation by contract to pay attorneys' fees in the event suit was brought to recover on any promissory notes so executed. That resolution was in

the following form: "On motion duly made and seconded, it was resolved that arrangements be made for borrowing such sums as may be needed, and that the president and secretary be authorized to execute notes therefor." (*Schallard* v. *Eel River Nav. Co.*, 70 Cal. 144, [11 Pac. 590]; *Gribble* v. *Columbus Brewing Co.*, 100 Cal. 67, [34 Pac. 527].) No doubt, under the terms of the resolution quoted, the president and secretary were authorized to execute promissory notes which would contain all usual and customary terms and conditions, but we cannot take notice of the fact, if it be a fact, that it is usual and customary for such notes to contain a contract for the payment of attorney's fees in the event of suit. The record as it is presented contains no evidence showing or tending to show that the condition requiring the payment of attorney's fees in the event of suit is one customarily and usually incident to the terms of such contracts. Attorneys' fees were therefore improperly allowed.

The further contention that the stockholders are not subject to the personal liability imposed by the statute of this state (Civ. Code, sec. 322), which makes a shareholder in a corporation responsible for the payment of such a proportion of the debts of the corporation as the number of shares owned by such shareholder bears to the whole of the subscribed capital stock, may be disposed of by reference to the decision rendered by the supreme court on August 31, 1910 (see *Thomas* v. *Wentworth Hotel Co.*, 158 Cal. 275, [139 Am. St. Rep. 120, 110 Pac. 942]), holding that the stockholder of a corporation organized under the laws of Arizona for the purpose of doing business in the state of California is liable and must respond to the claims of creditors in the amount prescribed by the Civil Code, section 322.

It follows from the conclusions we have expressed that the judgment and order must be reversed, and it is so ordered.

Allen, P. J., and Shaw, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on July 13, 1911, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 12, 1911.

Beatty, C. J., dissented from the order denying a hearing by the supreme court and filed the following opinion on August 15, 1911:

BEATTY, C. J.—I dissent from the order denying a rehearing. The directors of the corporation had no authority to release any portion of its subscribed capital except by way of a *bona fide* compromise with an insolvent subscriber, and the recitals in their records are not competent evidence against either stockholders or creditors that Bachman or either of the Fleishhackers was insolvent or believed to be insolvent on the twenty-third day of August, 1906—the date of the supposed compromise. Aside from these recitals there is no evidence that either of them was then or has been since insolvent or suspected of insolvency. If, therefore, as I have no doubt is true, the burden of proving these essential facts was on the defendants, the resolution or agreement of August 23, 1906, was properly held to be *ultra vires* and ineffectual until duly ratified by the stockholders, and there is not the slightest pretense of even an implied ratification prior to the date of the first loan, the loan of the First National Bank of Pasadena, made on October 5, 1906. Conceding, then, that the officers of that bank are chargeable with knowledge of what appeared upon the records of the corporation and of other existing conditions, all that they knew was that the directors had, without authority and contrary to law, attempted to release the obligation of solvent subscribers to the capital of the corporation. A subsequent ratification by the stockholders of a void release would not have the effect of impairing the rights of existing creditors. But even if it could be allowed that effect, there was no subsequent ratification by the stockholders. Certainly there was no express ratification, and the only pretense of an implied ratification is the fact that at a stockholders' meeting on October 10th Bachman and the Fleishhackers voted only one-half of the stock they had subscribed for. This would have been a very inconclusive circumstance if all the other stockholders had been present. But all the other stockholders were not present either in person or by proxy. The entire number of shares (3,500) had been subscribed, only 3,001 shares were represented at this meeting, leaving 499 shares unaccounted for, and excluding the 350 shares surrendered

by Bachman and the Fleishhackers there were 149 shares wholly unrepresented. This was fatal to a ratification even if it had been express in terms instead of having to rest upon a doubtful implication.

What is here said regarding the first attempted release applies equally to the subsequent attempted release of the Neustadters, of whose insolvency there is no evidence—a transaction never expressly ratified, nor ratified by any pretence of acquiescence until after the loan made in November by the Union Savings Bank.

As to the supposed estoppel of nonconsenting stockholders arising out of the fact that the directors were able to dispose of 150 out of the 350 shares surrendered by Bachman and the Fleishhackers at their par value, I do not understand the principle upon which it rests. This was but a partial restoration to the trust fund of a larger amount unlawfully diverted—it was at most a compensation *pro tanto* to the stockholders, and a reimbursement *pro tanto* of the trust fund for the benefit of creditors. Nor can I understand how an estoppel of the stockholders of a corporation can be held to impair the rights of creditors. The partial reimbursement of the fund, it is true, entitled the defendants to a proportional credit, and it was given that effect in the judgment of the superior court, which, in my opinion, should have been affirmed.

Melvin, J., concurred.